## FEDERAL LIFE INS. CO. v. KEMP et al.

(Circuit Court of Appeals, Seventh Circuit.   January 10, 1919.)

No. 2567.

1. INSURANCE ⬰146(1)—CONSTRUCTION OF CONTRACT—ELEMENTS FOR DETER-
MINATION.

   While the terms of an insurance policy framed by the insurer are to be construed, if ambiguous, most strongly against him, even such ambiguous provisions are to be interpreted in the light of surrounding circumstances, with regard to the evident purpose of the parties and the nature of the general undertaking of the insurer towards its policy holders, whether the insurer be a mutual or a stock company.

2. INSURANCE ⬰367(2)—CONSTRUCTION OF POLICY—SURRENDER VALUES—DE-
DUCTION OF INDEBTEDNESS.

   Where an insurance policy provided that, in case of default by the policy holder, he might accept a cash surrender value, a paid-up life policy, or extended insurance, and at the time of default in the payment of premiums the policy holder was indebted to the insurer for more than the cash surrender value of the policy, the right of the insurer under the policy to deduct the indebtedness applied to the surrender value in terms of extended insurance, and not merely to the cash surrender value.

3. INSURANCE ⬰367(2)—CONSTRUCTION OF POLICY—"INDEBTEDNESS ON AC-
COUNT OF POLICY."

   Where a life insurance contract provided for a cash payment of premiums annually of 50 per cent., the remaining part of the premium to be considered an indebtedness, such indebtedness was an "indebtedness on account of the policy," within a policy provision for deduction of indebtedness from the surrender value of the policy in case of default in payment of premiums.

In Error to the District Court of the United States for the District of Indiana.

Action by L. Scott Kemp and others against the Federal Life Insurance Company. Judgment for plaintiffs, and defendant brings error. Reversed and remanded.

James C. Jones, for plaintiff in error.

Frank C. Dailey, of Bluffton, Ind., for defendants in error.

Before BAKER, MACK, and ALSCHULER, Circuit Judges.

MACK, Circuit Judge. In an action by the children, assignees of insured, on a $10,000 twenty-payment life policy issued by a company which was reinsured by defendant, judgment was entered on a directed verdict for plaintiffs in the sum of $8,475.41, the face of the policy less the amount concededly due on a loan, plus interest. The facts are not disputed; the controversy turns on the construction of the policy and the accompanying certificate of loan, the essential portions of which are copied as an appendix hereto.

Concededly, the policy lapsed on December 31, 1910, for nonpayment of the eleventh premium, unless it was continued in force for the face amount under the extended insurance provision. The premiums were $365 annually for 20 years; pursuant to the terms of the premium loan certificate bearing even date with the policy and executed concurrently therewith, only one-half of the first ten annual premiums, $182.50 each, was paid in cash. When the eleventh premium was due, the unpaid one-half of the first ten premiums, with interest, amounted to $2,278.77. The insured died July 31, 1914. No application was made within 30 days or within 6 months after December 31, 1910, for any of the methods of settlement specified in paragraph 8 of the conditions. If the first ten premiums had been paid in full, the insured would have been entitled, at the time of default in payment of the eleventh premium, to extended insurance for 15 years and 233 days, and thus, at the time of his death in 1914, the policy would have been in force for its face amount. A like situation arises if the loan be deemed an obligation separate and distinct from the policy, and not to be deducted from the value of the extended insurance at the time of the lapse.

If, however, the surrender value at that time, whether expressed in dollars or extended insurance, is to be reduced by the amount of the then existing loan as an indebtedness on account of the policy, then, as the loan exceeded the then guaranteed cash values and loan values specified on page 3 of the policy, and also exceeded the then value of the 15 years and 233 days of extended insurance, testified to be $2,074.20, there was no value remaining for the purchase of any extended insurance.

Life insurance under such a policy as the one in question is based upon the creation out of the annual premiums of a reserve fund which at compound interest will equal the face of the policy at the expiration of a certain time, determined by certain mortality tables based upon experience. The annual premium charged is in excess of this amount; this excess provides for the expenses of the company and losses greater than those counted upon; out of any balance, dividends are paid and surpluses accumulated.

It is the reserve fund which enables the company to guarantee certain loan and cash surrender values at stated periods; and it is this same fund which enables it to offer, on a default, an extension of the insurance for definite periods without payment of further premiums. The reserve in whole or in part is used to pay a single premium for the extended term insurance, which the insured may thus purchase in lieu of surrendering the policy for cash or taking a pro rata amount of insurance, in case he is compelled to lapse the policy by his inability to keep on paying the stipulated premiums.

[1] An insurance company, like an individual, may disregard the fundamental elements of legitimate business and by contract agree to give its policy holders, or some of them, privileges which, if given to all, would inevitably result in time in insolvency; and if the contract clearly so provided, the folly of it would be no defense to its enforcement. But all contracts are to be interpreted in the light of the surrounding circumstances; and while the terms of an insurance policy, framed as they are by the insurer, are to be construed, if ambiguous, most strongly against him, yet even ambiguous provisions are to be interpreted with regard to the evident purposes of the parties and the nature of the general undertakings of the insurer towards its policy holders, and that, too, whether the insurer be a mutual or a stock company.

Even, therefore, if there were some ambiguity in the provisions of these form documents which constitute the contract, an interpretation which would necessarily result in eventually destroying the insurer and thus rendering performance of similar obligations to others impossible should not be given to it, if any other reasonable construction could fairly be given to the language used. The question in this case is: What "indebtedness on account of this policy" is embraced within that phrase as used in the cited passage from page 3 of the policy, and what "surrender value" does it reduce?

Plaintiffs contend that the loans covered by the premium loan certificate are independent of the policy and not intended to be covered by this clause; further, even if they are included therein, the "surrender value" to be reduced thereby in case of lapse is only the "cash surrender value" specified in the table on page 2 of the policy, and not the automatic alternative option of the extended insurance. Specifically, they urge that under this option the insurance, on lapse in the payment of the eleventh premium, was automatically extended for 15 years and 233 days for the face of the policy; that the unpaid half of the ten premiums constituted a loan, not enforceable directly as a debt, but only as a lien upon and payable out of proceeds of the policy on its maturity; if death occurred during this extension period, as it did occur, the face of the policy, less the loan, would then be payable; if, however, death should occur after the extension period, and when, therefore, the insurance would no longer be in force, while the company would not have to pay the insurance, it could not collect the amount loaned.

If these contentions are to be upheld, the practical result is this: That the company on December 31, 1910, had already paid out, by

way of a conditional loan, nearly the entire reserve held by it on the policy; that although it no longer had the money in hand to pay for the extended insurance for over 15 years, it was nevertheless bound to grant it practically without charge; that, if the insured outlived the 15 years, it would thus have made a gift of this insurance cost during that period, and only if he died during that period would it be repaid the loan. Such a contract, given to all policy holders, would inevitably bankrupt the company.

[2] In our judgment, these contentions are not to be upheld. Not only is a different construction of the policy consonant with sound business principles, fair and reasonable; it is, we believe, the only fair interpretation of the language, practically free of any ambiguity. The privileges accorded a defaulting policy holder are three. He may accept any one of them: The cash, paid-up policy good for life, or extended insurance good only for fixed periods, which he will be entitled to dependent upon the time of default, as specifically stated in the table of surrender values. This table is termed "Table of Loans and of Surrender Values Either in Cash, Extended or Paid-Up Assurance." While loans are necessarily cash, clearly surrender values may be cash, or a paid-up policy, or extended insurance; any of these is equally a thing of value to be given in exchange for the surrendered and defaulted policy.

What surrender value, then, is to be reduced if "an indebtedness on account of the policy" be outstanding at the time of settlement in case of default in premium? Surely whichever of the three may be selected. Concededly, if a cash surrender value were the option selected, the indebtedness would be deducted. The parties cannot reasonably be held to have intended that a paid-up policy or extended insurance could be taken in lieu of the cash, and that, in that event, the debt, which, under the loan privilege given in the table, might exceed the cash value and be nearly the entire reserve, might remain unpaid in whole or in part. The insurance, paid-up or extended, is a surrender value expressly specified as such in the table, exactly the same as the cash value. In Hay v. Meridian Life, etc., Co., 57 Ind. App. 536, 101 N. E. 651, 105 N. E. 919, the provisions were entirely unlike those in the instant case; furthermore the language was vague and ambiguous, and therefore properly interpreted in favor of the insured. Francis v. Prudential Ins. Co., 243 Pa. St. 380, 90 Atl. 205, is closer to the case in hand. While we cannot concur in the reasons given by the court for its conclusions, or in these conclusions, the case is distinguishable on the facts; for there the indebtedness was expressly stated to be deductible from the amount payable as extended insurance, not as here from the surrender value at the time of lapse, whether in cash, paid-up or extended insurance.

[3] Clearly, too, this premium loan is "an indebtedness on account of this policy." The premiums were $365 cash annually; the loan certificate, executed contemporaneously with the policy, expressly bound the maker to pay this premium in full, but only one half in cash, the other half to be secured by a lien on the policy. While the payments on the certificate were to terminate on the surrender or

expiration of the policy, the indebtedness, if any, theretofore created remained as a lien on the policy; as it was for a portion of premiums essential to have kept the policy in force, it was clearly "on account of this policy." We find no basis in the documents for limiting "an indebtedness on account of the policy" to the loans specified in the table of guaranteed loan values.

Anson v. New York Life Ins. Co., 252 Ill. 369, 96 N. E. 846, 37 L. R. A. (N. S.) 555, is not at all in point. The indebtedness there sought to be deducted was entirely extraneous; it arose out of the insured's transactions as a company agent.

The judgment must be reversed, and the cause remanded for retrial.

### Appendix.

The policy provided for the payment of $10,000 "(less any indebtedness due the company on this policy)" on proof of death, while the policy was in force, "subject to the privileges and conditions stated on the second and third pages hereof, which are made a part of this contract."

The eighth paragraph of privileges and conditions, on the second page of the policy, reads as follows:

"If this policy shall become void by the violation of any stipulation or agreement, all payments made or accepted hereon shall be retained by and shall belong to the company, except that if after three full years' premiums shall have been paid on this policy, it shall cease or become void solely by the nonpayment of any premium when due, the owner will be entitled, on legal surrender of this policy within thirty days thereafter to one of the methods of settlement provided in the table upon the third page hereof at the date of surrender, as follows:

"1. Receive a paid-up life policy for the amount specified in the said table; or,

"2. Receive the amount specified in the said table as the cash value of this policy; or,

"3. Should no choice be made within said thirty days of one of the foregoing methods of settlement, and providing application is made therefor within six months from date of default of payment of premium, the owner of this policy will still be entitled to receive a certificate extending this assurance, for the face value of this policy, for the number of years and days specified in the said table, subject to the conditions regarding proofs of death specified on the face of this policy, provided that, if death occurs within three years from the date of such certificate and during the term covered by such extended assurance there will be deducted from the amount payable the amount of the premiums which would have been paid had there been no lapse."

On page 3 of the policy is a table headed "Table of Loans and of Surrender Values, Either in Cash, Extended or Paid-Up Assurance, and Additions at Death." While the table covers each year from three to twenty, only the tenth year is essential here. It reads:

| At End of | Loan Values. | Cash Value. | Total Amount Payable at Death. | Extended Assurance. | | Paid-up Life Policy. |
| | | | | Years. | Days. | |
|---|---|---|---|---|---|---|
| 10th Yr. | 2,250.00 | 1,965.00 | 11,965.00 | 15 | 233 | 5,000.00 |

After the table on page 3, was the following:

"Any indebtedness on account of this policy outstanding at the time of settlement as provided by the terms of paragraph 8 of privileges and conditions upon the second page hereof, will correspondingly reduce the surrender value specified in the above table."

At the time the policy was issued, it was agreed that the insured might pay half of each annual premium, $182.50, in cash, and that the remaining half of the premium, with compound interest at 4 per cent., should become an indebtedness secured by a lien against the policy.

The agreement with respect to this, executed concurrently with the policy, is evidenced by the "Premium Loan Certificate" as follows:

### "Premium Loan Certificate.

"Whereas, the Interstate Life Assurance Company, of Indianapolis, Indiana, has accepted an application, and issued, upon the statements contained therein, a policy of assurance upon my life in the sum of ten thousand dollars, I hold myself duly bounden to the said company in the sum of three hundred sixty-five and no/100 dollars, annually for twenty years, unless said policy be sooner terminated by death or surrender, payable upon the terms and conditions as herein provided.

"1. The true intent and purpose of this loan certificate is that I hold myself bound to pay for said policy of assurance a sum of money annually, the cash part of which shall be fifty per cent. (50%) of the premium thereon.

"2. In order that the terms and conditions of this loan certificate shall be made good, the company shall have a lien upon the policy of assurance upon my life, in payment for which it is given, to the extent of the annual differences between the cash paid and the full premiums, with four per cent. (4%) interest thereon, computed in accordance with insurance law and mathematics. In the event of the policy for which the loan certificate is given becoming a claim by death within twenty years from the date of this policy, there shall be paid thereon the profits apportioned thereto.

"3. The payments on the loan certificate shall terminate upon the surrender to the company of the policy upon which it is predicated, or at the expiration of twenty years from the date thereof.

"Signed and witnessed this 31st day of December, 1900.

"Stephen Bruce Kemp, Maker."